613 So.2d 846 (1993)
Nancy SWAN
v.
I.P., INC., Miri, Inc., and James C. English, a Joint Venture, and Carboline Company.
No. 89-CA-1255.
Supreme Court of Mississippi.
February 4, 1993.
*847 Judy M. Guice, Paul S. Minor, Minor Benton & Guice, Biloxi, for appellant.
William M. Rainey, Franke Rainey & Salloum, James O. Dukes, Bryant Colingo Williams & Clark, Mark W. Garriga, Harry R. Allen, Allen Cobb & Hood, Gulfport, for appellees.
En Banc.
HAWKINS, Chief Justice, for the Court:
Nancy Swan, a former teacher at Long Beach Junior High School, filed this action on January 7, 1986, in the Circuit Court of Harrison County, First Judicial District, alleging injury as a result of exposure to fumes and spray of polyurethane roofing materials being used to re-roof Long Beach Junior High School in October, 1985. Initially named as defendants were I.P., Inc. (I.P.), the manufacturer of the polyurethane *848 foam used during the roofing project, and Miri, Inc. (Miri), the local polyurethane roofing contractor which applied the roofing materials to the school. In her First Amended Complaint, Swan added Carboline Company (Carboline), the manufacturer of the polyurethane coating used during the roofing project, as a defendant. In her Second Amended Complaint, Swan added as a defendant James C. English, the president of Miri, alleging that at all material times he was engaged in a joint venture with Miri. Swan's allegations against I.P. and Carboline were based on negligence, strict liability and breach of warranty. Her allegations against Miri and English were based solely on negligence.
On January 10, 1989, one week prior to trial, the trial court granted summary judgment in favor of I.P., Carboline and English. The next day Miri filed its motion for summary judgment and the trial court granted summary judgment in favor of Miri on October 11, 1989. The trial court denied Swan's motion to reconsider, and Swan now appeals to this Court raising the following assignments of error:
1. THE COURT ERRED IN GRANTING SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS I.P. AND CARBOLINE.
2. THE COURT ERRED IN GRANTING SUMMARY JUDGMENT IN FAVOR OF MIRI.
3. THE COURT ERRED IN GRANTING SUMMARY JUDGMENT IN FAVOR OF JAMES C. ENGLISH.
In addition, I.P., Carboline, Miri and English raise the following issues on cross-appeal:
4. THE LOWER COURT ERRED IN REFUSING TO ORDER THE PLAINTIFF TO SUBMIT TO AN INDEPENDENT MEDICAL EXAMINATION.
5. THE LOWER COURT ERRED IN FAILING TO DISMISS AND/OR GRANT SUMMARY JUDGMENT AS TO PLAINTIFF'S PUNITIVE DAMAGE CLAIMS.
6. THE LOWER COURT ERRED IN LIMITING THE DEFENDANTS' DISCOVERY OF THE PHYSICAL CONDITION OF WITNESSES WHEN THAT PHYSICAL CONDITION WOULD BE RELEVANT TO NANCY SWAN'S CLAIMS OF EXPOSURE TO TOXIC LEVELS OF ISOCYANATE AND THE MOTIVE, BIAS AND INTEREST OF THESE WITNESSES.
We reverse on both direct and cross appeals.

FACTS
On August 21, 1985, the Long Beach Municipal Separate School District entered into a contract with Miri, Inc. for the re-roofing of the Long Beach schools. [Swan alleges that James C. English was also a party to the contract.] The roofing system consisted of a sprayed polyurethane foam, manufactured by I.P., which provided insulation, and a polyurethane coating, manufactured by Carboline, which created the necessary waterproofing for the roof. The polyurethane foam manufactured by I.P. is known by the trade name "Isofoam SS0658" and contains the toxic ingredient methylene diphenyl isocyanate, or MDI. The color of the foam is beige when it is sprayed and it turns yellow as it begins to harden. The coating manufactured by Carboline is known by the trade name "Chem-Elast 2819S" and contains the toxic ingredient toluene diisocyanate, or TDI. The color of the coating is light gray.
Miri began working on the roof of Long Beach Junior High in early October, 1985. The school consists of eight separate buildings with sidewalks running between the buildings. The roofs of the buildings are approximately ten feet from the ground. Swan alleged that she was first exposed to the chemicals around noon on October 8, 1985, when she was accompanying her class to the cafeteria. She saw a yellow mist coming from the roof of a nearby building and she was soon in the middle of the mist, which had a strong, nauseating odor. She continued walking with the children to the cafeteria where she left them for the remainder of the lunch period, while she went to the teachers' lounge and to the *849 women's restroom. In the restroom she observed that Miri's workers had removed the turbine on the roof and had sprayed the foam into the restroom. She left because the odor of the foam was too strong. When she returned to her classroom after lunch, she saw the mist drifting down between the buildings. This continued most of the afternoon.
Shortly after Swan arrived at her classroom the next morning, she noticed that Miri's workers were spraying foam on the roof of the building which contained her classroom. The fumes from the foam were strong and nauseating. She opened the windows for approximately ten minutes which only made the smell worse. The spray left a yellow film on the windows. According to her, the spraying continued on her building all day except for one hour at lunch. During the lunch period, Swan and her class again had to walk through a cloud of spray on the way to the cafeteria. In addition to the nausea, the fumes also caused Swan's eyes to sting and burn. She opened her windows again that afternoon for about three hours because of the heat.
Other teachers and students complained to the school's administration about the physical effects of the spraying, and that afternoon the subject was discussed at a faculty meeting. Marlin Roger Ladner, the principal, told the teachers that from what he had read in a letter written by the architect who was handling the roofing project and other information he had received, the spray was not dangerous and would only cause mild irritation of the eyes. Ladner instructed the teachers to keep their classroom windows closed. Ladner testified that before Miri began spraying on October 8, Miri's employees informed him that any cars in the teachers' parking lot would need to be moved because the overspray could harm the cars' windshields and paint. According to Ladner, James English assured him that the spray was safe.
Swan testified that her physical condition worsened that night. She experienced "[b]urning, sharp pains" in her chest and shoulders and her eyes continued to burn and sting. She also discovered that she was suddenly extremely hoarse and unable to project her voice. She testified that her throat hurt when she spoke. She also experienced frequent, painful headaches. When she got up the next morning, she was unable to open her eyes because a "crusty" substance had formed over her eyes during the night. She had to soak her eyes with a wet washcloth until they would open.
Spraying operations continued on October 10, 1985. Miri's employees were spraying the roof of a building adjacent to her classroom and at times the mist drifted into Swan's classroom. She opened the windows several times because her students complained about the heat. When she took her students to the cafeteria during lunch period, they had to walk through a cloud of the spray and the particles got on Swan. Swan testified that water blisters developed on her arm either that afternoon or on Friday, October 11. After October 10 Miri no longer conducted spraying operations during school hours.
In addition to the physical problems described above, Swan testified that after her exposure to the spray, she often had problems maintaining her balance while walking. The right side of her body also became extremely weak, particularly her right arm and leg, and she suffered memory loss.
Two physicians by deposition testified that Swan's exposure to the chemical had caused serious throat and lung problems, and permanent brain damage.
James C. English testified that prior to October 7, 1985, Miri applied the foam and the coating at Long Beach Junior High during school hours. However, on October 7, 8 and 9, Miri applied the foam and coating only after all the children had left the school grounds, usually around 4:00 P.M. On October 10, Miri did spray the foam during school hours, but only when the children were inside the building. According to English, they stopped spraying on October 10 when the assistant principal told him that several children had complained about the spray getting in their eyes while walking to lunch. English testified *850 that the children were not sprayed with any foam or coating. Instead, English testified that when this incident occurred, his workers were merely blowing moisture off the roof with an airhose.
In its study entitled "Criteria for a Recommended Standard  Occupational Exposure to Diisocyanates", The National Institute of Occupational Safety and Health (NIOSH) found that exposure to TDI and MDI can cause irritation to the respiratory tract and reduced pulmonary function which can lead to a condition resembling asthma or chronic bronchitis. Diisocyanates are also skin irritants and can cause irritation to the eyes. NIOSH also noted that studies have indicated that exposure to TDI can have neurological effects. I.P.'s material data safety sheet for its foam stated that with overexposure, it was an irritant to the eyes and respiratory tract and may cause headaches, nausea, coughing, shortness of breath, chest pains and respiratory distress. Similarly, Carboline's material data safety sheet lists several effects of overexposure including respiratory tract irritation, headaches, dizziness and nausea.
In its study, NIOSH recommended establishment of a threshold level value, or acceptable concentration level, of exposure to isocyanates for employees at five parts per billion for a ten-hour work shift. NIOSH also defined this level as 35 micrograms per cubic meter for TDI and 50 micrograms per cubic meter for MDI. NIOSH recommended a ceiling limit of twenty parts per billion (or .02 parts per million) for a ten-minute period which should never be exceeded. Frank Livingston, I.P.'s R. 30(b)(6) designee, testified that I.P. had conducted studies which measured the concentration of MDI when sprayed in confined areas and in these studies, the concentration had never exceeded.02 parts per million. John Montle, Carboline's technical representative, testified that if Carboline 2819-S is sprayed outdoors, the level of the isocyanate in the vapor could exceed the threshold limit value in the immediate area between the spray gun and the surface of the roof. However, according to Montle, the probability of the level of isocyanate in the vapor exceeding the threshold level even a "few feet away" from the immediate area being sprayed is extremely low. The defendants produced several experts who specialized in isocyanate chemistry who also testified that the concentration of the isocyanate once it leaves the nozzle spray would be below the threshold limit value. Dr. Frisch testified that isocyanates are very reactive chemicals, and when the spray hits the surface of the roof, the isocyanates in the foam react immediately and form the polyurethane, leaving only trace amounts of isocyanates behind. The reaction process in the coating is slower, however. The isocyanates in any overspray would immediately react with the moisture in the air to form the harmless material polyurea.
In his first deposition, English stated that he had not been informed by either I.P. or Carboline prior to the spraying operations of any hazard associated with the inhalation of either the foam or coating. In his second deposition, English testified that sometime after October 8, 1985, he had seen a brochure which I.P. provided Dr. Bob Ferguson, the superintendent of the Long Beach schools, which described the foam and its physical properties. According to English, he had not been provided any information directly from I.P. concerning possible hazards of the foam. Also, his second deposition, English said that Carboline did provide him with a technical data sheet for the coating sometime before October 8, 1985. He also had seen a Carboline brochure or catalog entitled "Chem-Elast Lasts" at some time but he was not sure when. Robert English, James English's son who was Miri's foreman and one of its principal sprayers, testified that to his knowledge, Miri had not received any documents from either I.P. or Carboline setting forth any hazards associated with the use of the foam and coating.
Frank E. Livingston testified that I.P. did not send Miri, James English or the Long Beach school system any material data safety sheets for the foam or any other warnings at any time prior to Swan's exposure. The material data safety sheets *851 were sent to Long Beach Junior High School afterwards. In 1984, I.P. distributed copies of the Upjohn Technical Bulletin (recognized as the most complete compilation of information on polyurethane products and their safe application) to its distributors, including North Brothers, Inc. of Atlanta, whose Jackson office distributed the foam to Miri. Livingston had no knowledge as to whether the Upjohn Bulletin was ever distributed to Miri. John Montle and Van Rusling, Carboline's sales representative for the Gulf Coast, testified that Carboline provided material data safety sheets for its polyurethane coating to its customers upon request. Neither knew whether Miri ever requested a material data safety sheet.
James English testified that he and the other sprayers wore respirators when spraying the foam. He and Robert English both testified that before they began spraying on the roofs, they always instructed the school administration to make an announcement to the teachers instructing them to close the windows. If the teachers did not close the windows one of the Englishes or another employee of Miri would close the windows themselves. They also placed rope barricades around their work areas, although this was mainly done for the purpose of keeping the children away from the equipment. According to James English, representatives of both I.P. and Carboline visited the job site while the work was in progress and witnessed Miri's spraying procedures. None of the representatives expressed any concern about these procedures to Miri.

LAW

PART I. DIRECT APPEAL

A.

The Court Erred in Granting Summary Judgment in Favor of Defendants I.P. and Carboline
This Court conducts de novo review of a lower court's grant of summary judgment. Short v. Columbus Rubber and Gasket Co., 535 So.2d 61, 63 (Miss. 1988); Pearl River County Bd. of Supervisors v. South East Collections Agency, Inc., 459 So.2d 783, 785 (Miss. 1984) Dennis v. Searle, 457 So.2d 941, 944 (Miss. 1984).
The trial court granted summary judgment in favor of I.P. and Carboline based on the "learned intermediary" defense to products liability actions which provides that a manufacturer's duty to warn may be discharged by providing information to a third person upon whom it can reasonably rely to communicate the information to the ultimate users of the product or those who will be exposed to its hazardous effects. Adams v. Union Carbide Corp., 737 F.2d 1453, 1456 (6th Cir.1984); Note, Failures to Warn and the Sophisticated User Defense, 74 Va.L.Rev. 579 (1988). The relevant portion of the court's ruling reads as follows:
[I]'m satisfied that in  particularly in the  I think as the expressions were, in the Martinez case, citing the restatement of torts, section 388, and also the provisions concerning 402(a) that the reasoning behind this case and also taking into account the Helene Curtis decision which is recited in there, that this manufacturer of the product is placing a product not in the stream of commerce for the consumer to use themselves without any forewarning of the propensities of the product, but is placing this in the hands of professionals who are trained and experienced in the application of the product; that this manufacturer is not required to go further than to furnish information to the applicator or the professional who is going to use the product itself.
I can't think of a better analogy to use in this case than the facts in the Helene Curtis case of where a beautician is using a product and [sic] is put out for professional use only. How would the warnings get to the ultimate consumer? There has to be a reliance by the manufacturer at some stage in a product such as this that the professionals who are making the application, that they make it properly and use the precautions that are necessary and also to warn the consumer.
(R.V. 902)
Swan's claims against I.P. and Carboline are based on negligent failure to warn and *852 strict liability. Section 402A of the Restatement (Second) of Torts provides:
(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to its property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to its property if
(a) the seller is engaged in the business of selling such a product and,
(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
(2) The rule stated in Subsection (1) applies although
(a) the seller has exercised all possible care in the preparation and sale of his product, and
(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.
Lack of an adequate warning is a defect which makes a product unreasonably dangerous for strict liability purposes. Jackson v. Johns-Manville Sales Corp., 727 F.2d 506, 515 (5th Cir.1984); Gordon v. Niagra Machine & Toolworks, 574 F.2d 1182, 1190 (5th Cir.1978). This Court has extended this duty to bystanders, holding that the duty imposed by § 402A "exists in favor of anyone who may reasonably be expected to be in the vicinity of the product's probable use and to be endangered by it if it is defective." Coca Cola Bottling Co., Inc. v. Reeves, 486 So.2d 374, 378 (Miss. 1986).
I.P. and Carboline contend that they had no duty to warn Miri or Swan about any possible hazards associated with their products because Miri was an experienced, knowledgeable applicator of these products and is therefore charged with knowledge of the properties of the products. This argument stems from § 388 of the Restatement (Second) of Torts and Comment "k" under § 388. This section provides:
One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.
Comment "k" to § 388 provides in part:
k. When warning of defects unnecessary. One who supplies a chattel to others to use for any purpose is under a duty to exercise reasonable care to inform them of its dangerous character in so far as it is known to him, or of facts which to his knowledge make it likely to be dangerous, if, but only if, he has no reason to expect that those for whose use the chattel is supplied will discover its condition and realize the danger involved... .
The learned intermediary theory developed in cases involving prescription drugs. Courts have held that the manufacturer's duty to warn of dangers involved in the use of prescription drugs was fulfilled by warning physicians instead of the ultimate user, since the physician was in the best position to evaluate the needs of the patient along with the risks of a particular drug in order to determine the proper treatment for the patient. Am. Law Prod.Liab.3d § 32:34 (1987). This Court has applied the learned intermediary theory in prescription drug cases. Wyeth Laboratories, Inc. v. Fortenberry, 530 So.2d 688 (Miss. 1988). Generally, the cases discussing the learned intermediary theory which do not involve prescription drugs involve products which have injured employees on the job and the manufacturer's reliance on the employer to *853 warn the employee of the dangers of the product. See Note, 74 Va.L.Rev. at 596-600; R. Burpee, Manufacturers' Reliance on Employers' Duty to Warn, 33 For the Defense 22 (Oct. 1991).
I.P. and Carboline rely on several cases. In Martinez v. Dixie Carriers, Inc., 529 F.2d 457 (5th Cir.1976), the widow of a worker, who died when he was overcome by noxious fumes while cleaning the tank of a barge which had been carrying a petrochemical mixture, filed suit against the owner of the barge and the manufacturer of the mixture alleging inadequate warning. The manufacturer had placed a warning card on the main deck of the barge which set out the hazards associated with the chemicals. Id. at 462. The court held that the manufacturer was not liable for negligent failure to warn or strict liability. The court noted that the manufacturer marketed the chemical mixture only to industrial users and not to the general public, Id. at 463, and the manufacturer could reasonably anticipate that only professionals familiar with the precautions necessary for the safe handling of the chemicals would come into contact with the chemicals. The card placed on the barge was an adequate warning to the limited class of professionals, of which the plaintiff's husband was a member, who were experienced in the stripping and cleaning of chemical storage tanks. Id. at 467; see also Hawkins v. Evans Cooperage Co., Inc., 766 F.2d 904, 908 (5th Cir.1985); Strong v. E.I. DuPont de Nemours, Inc., 667 F.2d 682, 687 (8th Cir.1981); Thibodaux v. McWane Cast Iron Pipe Co., 381 F.2d 491, 495 (5th Cir.1967).
In Adams v. Union Carbide Corp., 737 F.2d 1453 (6th Cir.1984), the plaintiff, an employee of General Motors, filed suit against Union Carbide alleging that she suffered respiratory problems as a result of Union Carbide's failure to adequately warn the employees of General Motors of the hazards associated with toluene diisocyanate (TDI), which Union Carbide manufactured and supplied to General Motors for use in the automotive assembly process. Union Carbide had prepared a manual for General Motors which addressed the hazards associated with exposure to TDI and also included information on the safe use and handling of TDI and a chemical safety data sheet. Id. at 1454-55. Officials from Union Carbide and General Motors had also met to discuss the handling of TDI to minimize personnel exposure. The trial court granted summary judgment in favor of Union Carbide, and the Sixth Circuit affirmed. The court relied on Comment "n" to Restatement (Second) of Torts § 388 which states that the manufacturer's duty to warn may be discharged by providing information of the dangerous propensities of the product to a third person upon whom it can reasonably rely to communicate the information to the ultimate users of the product or those who will be exposed to its hazardous effects. Id. at 1456. The court held that the fact that General Motors repeatedly updated its information about TDI from Union Carbide, along with the fact that General Motors itself had a duty to its employees to provide them with a safe place to work, supported the conclusion that it was reasonable for Union Carbide to rely upon General Motors to convey the information about TDI to its employees. Id. at 1457; see also Kennedy v. Mobay, 84 Md. App. 397, 579 A.2d 1191, 1206 (1990).
In Smith v. Walter C. Best, Inc., 927 F.2d 736 (3rd Cir.1990), the plaintiff was injured as a result of his inhalation of silica dust contained in sand supplied by various parties to his employer. He claimed that the suppliers had a duty to warn him directly about the hazards of the dust. The court affirmed the trial court's entry of summary judgment in favor of the suppliers, finding that the plaintiff's employer was a knowledgeable industrial purchaser of silica sand familiar with its dangers. Id. at 741. The court analyzed whether it was reasonable for the suppliers of the sand to rely on the plaintiff's employer to warn its employees about the hazards of the sand under the factors set out in Comment "n" to § 388 of the Restatement:
(1) the dangerous condition of the product;

*854 (2) the purpose for which the product is used;
(3) the form of any warnings given;
(4) the reliability of the third party as a conduit of necessary information about the product;
(5) the magnitude of the risk involved; and
(6) the burdens imposed on the supplier by requiring that he directly warn all users.
Id. at 739-40. The court held that it was reasonable for the sand suppliers to rely on the plaintiff's employer to warn the plaintiff of the dangers. Id. at 741. The court listed several facts which led it to this conclusion: (1) common medical knowledge of the hazards; (2) there were various statutes and regulations governing silica; (3) the employer was a member of a non-profit foundation which provided information to its members relative to occupational diseases, including silicosis, and their prevention; and (4) the duty of the employer to provide its employees a safe working environment. Id. The court therefore held that the suppliers did not have a duty to warn the plaintiff directly of any hazards associated with the sand. Id.; see also Tasca v. GTE Products Corp., 175 Mich. App. 617, 438 N.W.2d 625, 629 (1988).
In its ruling on the motion for summary judgment, the trial court referred to Helene Curtis Industries, Inc. v. Pruitt, 385 F.2d 841 (5th Cir.1967). In Helene Curtis, the plaintiff's scalp and ears were burned by a mixture of two bleaching products purchased from a beauty parlor and applied to the plaintiff's hair by a friend. Id. at 847. The plaintiff alleged that she was not adequately warned. The label on the Helene Curtis product stated: "FOR PROFESSIONAL USE ONLY  NOT FOR PUBLIC SALE." Id. at 857. It also warned against mixing the product with any products other than one recommended by Helene Curtis. Id. at 852. The 5th Circuit Court held that Helene Curtis was not liable, and that the warning was sufficient because it need only be reasonably calculated to reach and be understood by the person likely to use the product, the professional beautician. Id. at 861. The sale of the product by the beauty parlor to the plaintiff's friend was an intervening cause of the plaintiff's injuries, as was the mixing of the two bleaching products by the plaintiff's friend. Id.
These cases are distinguishable. Unlike Helene Curtis, the polyurethane foam and coating were applied by an intended, professional user. In Martinez, the manufacturer of the chemicals placed a warning on the barge and it was unlikely that anyone but professional tank cleaners would come into contact with the chemicals. Swan received no warnings concerning the hazards associated with the chemicals and it is not certain that Miri received warnings from the manufacturers. Also, the likelihood that someone not knowledgeable about the hazards of the chemicals would come into contact with the chemicals was more likely in this case because the chemicals were being sprayed at a school. In Adams and Smith, the plaintiffs' employers had knowledge of the hazards associated with TDI and the silica dust. Here, although James English and Miri had much experience spraying polyurethane foam and coating, they both testified that they were not aware of any hazards associated with the spraying.
In other cases, courts have held that the presence of an intermediary did not relieve the manufacturer of its duty to warn. In Borel v. Fibreboard Paper Products Corp., 493 F.2d 1076 (5th Cir.1973), an insulation worker brought an action against the manufacturers of insulation which contained asbestos. The court rejected the manufacturers' argument that it was the responsibility of the insulation contractors to warn the insulation workers of the risk of harm. Id. at 1091. The court noted that under the Restatement, a seller may be liable to the ultimate user or consumer for failure to give adequate warnings. The seller's warning must be reasonably calculated to reach such persons and the presence of an intermediary party will not by itself relieve the seller of this duty. Id.; see also Hammond v. North American *855 Asbestos Corp., 97 Ill.2d 195, 73 Ill.Dec. 350, 357, 454 N.E.2d 210, 217 (1983).
In Hall v. Ashland Oil Co., 625 F. Supp. 1515 (D.Conn. 1986), a widow brought suit against a manufacturer of benzene who sold benzene to her deceased husband's employer. The manufacturer filed a motion for summary judgment based on the learned intermediary theory, arguing that when a product is sold in bulk to an industrial user for use by its employees, the supplier's duty to warn extends only to the employer as a learned intermediary. Id. at 1518. Further, that a supplier's duty to warn an industrial purchaser is excused where the purchaser is held to know of the risks independently. Id. The court held that even if the learned intermediary theory were to be applied to cases involving the sale of chemicals in the industrial workplace, that theory alone would not relieve the supplier of a duty to warn. Id. at 1520. The court noted that the prescription drug cases which apply the learned intermediary theory merely shift the direction that such a warning must take, by requiring the manufacturer to provide an adequate warning to the intermediary. Id. The court held that the facts were disputed as to whether the manufacturer supplied any warnings to the deceased's employer and as to whether the deceased's employer could be considered knowledgeable of the health risks associated with benzene. Id. at 1520-21; see also Garner v. Santoro, 865 F.2d 629, 641-42 (5th Cir.1989); Frazier v. Continental Oil Co., 568 F.2d 378, 385 (5th Cir.1978).
In Adkins v. GAF Corp., 923 F.2d 1225 (6th Cir.1991), the supplier contended that § 388 of the Restatement relieved it of its duty to warn since it sold the asbestos to a "sophisticated user," the plaintiff's employer, which had full knowledge of the hazards associated with the use of asbestos and which could be relied upon to take the appropriate precautions. Id. at 1229. The court stated that the pivotal inquiry in determining whether this defense is available is a fact-specific evaluation of the reasonableness of the supplier's reliance on the intermediary to provide the warning. Id. at 1230. In a similar case, the Fourth Circuit stated that Comment "n" to § 388 of the Restatement clearly focuses on what the product manufacturer knew and the reasonableness of its reliance on the intermediary prior to and during the time the plaintiff was exposed. Willis v. Raymark Industries, Inc., 905 F.2d 793, 797 (4th Cir.1990); see also Whitehead v. St. Joe Lead Co., 729 F.2d 238, 253-54 (3rd Cir.1984); Russo v. Abex Corp., 670 F. Supp. 206, 208 (E.D.Mich. 1987); East Penn Mfg. Co. v. Pineda, 578 A.2d 1113, 1120-22 (D.C.App. 1990).
In Little v. Liquid Air Corp., 952 F.2d 841 (5th Cir.1992), the Court of Appeals held that the bulk seller doctrine provides that a bulk seller, who sells a product to another manufacturer or distributor which in turn packages and sells the product to the public, is required only to warn the intermediate distributor, and not each individual consumer, that the product is dangerous. Id. at 850. The bulk seller may rely on an informed distributor to pass information concerning the dangers of the product to the consumer. Id. at 850-51. However, the bulk seller's reliance upon the intermediate distributor must be reasonable, Id. at 851, and it fulfills its duty to the ultimate consumer only if it ascertains (1) that the distributor to which it sells is adequately trained, (2) that the distributor is familiar with the properties of the product and the safe methods of handling it, and (3) that the distributor is capable of passing this knowledge to the consumer. Id.
I.P. and Carboline contend that because they sold the foam and coating to Miri, a professional applicator chargeable with knowledge of the properties of the products, they had no duty to warn. Miri and James English indeed are experienced applicators of polyurethane roofing products. Miri's primary business was insulation and polyurethane roofing and the company had been involved in this business since 1977. This Court recognized that James English was a qualified and experienced roofer in Anchor Coatings, Inc. v. Marine Industrial Residential Insulation, Inc., 490 So.2d 1210, 1217 (Miss. 1986).
*856 The learned intermediary defense does not relieve the manufacturer of its duty to warn, however, unless the manufacturer's reliance on the intermediary is reasonable. Material issues of fact exist in this case as to whether I.P.'s and Carboline's reliance on Miri was reasonable. From this record we do not know whether James and Robert English, the principal sprayers of the foam and coating, had knowledge of the hazards associated with the foam and coating. James English testified that had he known of any hazards associated with the products, he would not have sprayed them while school was in session. Robert English testified that at the time the foam and coating were sprayed on the roof of the school, he had no knowledge of any hazards associated with the foam or the coating.
From this record we cannot know whether it was reasonable for I.P. and Carboline to assume that Miri was knowledgeable about the hazards because the facts are in dispute as to whether I.P. and Carboline ever sent Miri any information concerning the chemical properties of the products and the hazards associated with them.
Frank E. Livingston testified that I.P. did not send Miri, James English or the Long Beach school system any material data safety sheets for the foam or any other warnings at any time prior to Swan's alleged exposure.
Also, because the evidence was insufficient to conclude that Miri was a sophisticated user, the learned intermediary doctrine still required I.P. and Carboline to furnish information and warnings to Miri. See Hall, 625 F. Supp. at 1518. The trial court recognized this in its ruling: "[T]his manufacturer is not required to go further than to furnish information to the applicator or the professional who is going to use the product itself." Because of these disputed material issues of fact, the trial court erred in granting summary judgment in favor of I.P. and Carboline.

B.

The Court Erred in Granting Summary Judgment in Favor of Miri
Summary judgment in favor of Miri was based on foreseeability. Swan's claim against Miri was on negligence. A defendant is not liable for negligence if he could not have reasonably foreseen any injury as a result of his actions. Marshall Durbin, Inc. v. Tew, 362 So.2d 601, 603 (Miss. 1978); Pargas of Taylorsville, Inc. v. Craft, 249 So.2d 403, 407-08 (Miss. 1971).
Miri contends that the evidence clearly demonstrates that it could not have reasonably foreseen any injury to Swan. In support of this argument, Miri points to James English's testimony that the company had never received any prior complaints from bystanders concerning injuries received as a result of Miri's spraying. Also, representatives of Carboline and I.P. visited the work site and observed Miri spraying the foam and coating during school hours, but never instructed Miri to discontinue the spraying while school was in session. Jay Venable, a roofing contractor experienced with the application of polyurethane roofing products and hired as an expert by Miri, testified that in his opinion there were no health hazards associated with the application of the products used by Miri. He did state that the overspray could cause some slight eye irritation. Id. Id. at 182. According to Venable, the main concern the roofing contractor has when applying these products is preventing the overspray from causing damage to car windshields, eyeglasses and other property. Id. at 120. Venable testified that the best procedure was to avoid spraying when anyone was outside the building and downstream from the operations.
There was evidence that Miri should have foreseen that the spraying could injure a bystander as Swan: Miri was aware that there was some danger presented by the spraying; its sprayers wore respirators during the spraying operations. James and Robert English also took precautions to make sure that the teachers closed their classroom windows during spraying operations. They also placed rope barricades around their work areas, although this was mainly done for the purpose of keeping the children away from the equipment. Also, *857 Jay Venable testified that he would always ask the manufacturer's representative for the product's material data safety sheet and technical information before beginning a spraying project. Miri apparently did not request any information from the manufacturers. Also the principal of the school informed either James English or one of Miri's employees that several children had complained that the spray was irritating their eyes. Swan testified that on one occasion she and her students were enveloped by a cloud of particles from the roof while on their way to lunch. Miri could reasonably have foreseen that spraying the materials while people were walking to lunch could lead to injuries.
The trial court erred in granting summary judgment in favor of Miri.

C.

The Court Erred in Granting Summary Judgment in Favor of James C. English
James English filed a motion to dismiss him individually as a defendant, alleging that his relationship with Miri (which has since gone out of business) was not that of a joint venture but instead was merely one of employer/employee. (R.IV. 634-35) The trial court treated English's motion as a motion for summary judgment (R.V. 916) and dismissed English as a defendant.
Without further lengthening this opinion, there was sufficient evidence to show English was a joint venturer with Miri, as well as president of the corporation.

PART II. CROSS-APPEAL

A.

Punitive Damages
The defendants claim they are entitled to summary judgment on the issue of punitive damages. We do not address this issue, which may be considered by the circuit court following trial on remand.

B.

The Lower Court Erred in Limiting the Defendants' Discovery of the Physical Condition of Witnesses
During discovery the defendants noticed the depositions of sixteen children who attended Long Beach Junior High who, along with Swan, were represented by Swan's counsel. These students are: Gretchen Dawn Bell, Sean Curlee, Melissa Dedeaux, Misty Dedeaux, Terri Haas, Libby Kenworthy, Dawn Lawson, Ruth Locke, Angela Merrill, Pamela Merrill, Monica Miles, Tracy Parks, Henry Polk, Frankie Robbins, William Frazier and Alana Saucier. These children were allegedly also exposed to the chemicals during the spraying operation. The defendants only deposed four of the students: Tracy Parks, Gretchen Bell, Sean Curlee and William Frazier. Swan and the remaining students filed a motion for a protective order prohibiting the depositions of the other students on the grounds of relevance and cumulativeness. The trial court overruled the protective order but ruled that "inquiry of these deponents regarding their physical condition resulting from alleged toxic exposure and treatment by physicians will be limited to October 8, 9 and 10, 1985, and those deponents will not be required to answer any questions regarding any medical treatment received after those dates."
On cross-appeal, the defendants contend that the trial court abused its discretion in limiting the depositions and argue that if the case is remanded, they should be allowed to depose the students with regard to their physical condition and treatment received after October 10, 1985. If not, they contend that the students should not be allowed to testify at the trial. They argue that the students' physical condition after October 10, 1985, is relevant to Swan's claim since the students were allegedly exposed to the same chemicals at the same time Swan was allegedly exposed to them. Swan counters that the defendants were given sufficient evidence in the depositions of the students which were taken concerning the symptoms experienced by the students. She also argues that the students had not taken any action to waive the medical privilege.
The scope of discovery is set out in MRCP 26(b)(1) which provides: "Parties *858 may obtain discovery regarding any matter, not privileged, which is relevant to the issue raised by the claims or defenses of any party." The physical condition of the students after October 10, 1985, is relevant to Swan's claim for discovery purposes. Swan contends that she suffered many adverse effects long after October 10, 1985. Since the students were allegedly exposed to the same chemicals for approximately the same length of time as Swan, knowledge of any long lasting physical effects the chemicals had on the students would be "reasonably calculated to lead to the discovery of admissible evidence." Rule 26(b)(1).
We hold that Swan has no standing to object on the ground of medical privilege to any discovery about whatever possible effects this spraying had on these children as well.
This does not foreclose the right of any of these minor witnesses, their parents or guardians, presenting to the court and securing ruling thereon of any valid objections or medical privileges which these children as individual witnesses may have.
SULLIVAN, Justice, for the Court:

PART II. CROSS-APPEAL

C.

The Lower Court Erred in Refusing to Order the Plaintiff to Submit to an Independent Medical Examination
On cross-appeal, the defendants claim that the trial court erred when it overruled their two motions for an independent medical examination of Swan. The defendants had asked the trial court to order Swan to make herself available for an independent medical examination by Dr. Herbert H. Schaumberg, an expert neurologist designated by the defendants as an expert witness. The defendants argue that since Swan alleges that she has suffered numerous injuries as a result of her exposure to the isocyanates and has been examined by several of her own medical experts, they should be allowed to protect their interests by having Swan examined by one of their experts.
The defendants recognize that the Mississippi Rules of Civil Procedure do not provide for independent medical examinations. Mississippi specifically declined to adopt a rule similar to MRCP 35, which gives the court the authority to order a party whose physical or mental condition is in controversy to submit to an independent medical examination. The comment to the Omitted MRCP 35 refers to Miss. Code Ann. § 9-3-63 and states that the subject of Rule 35 is beyond the scope of the legislation pursuant to which the Mississippi rules were adopted. Miss. Code Ann. § 9-3-63 provides:
Rules prescribed pursuant to sections 9-3-61 to 9-3-73 shall not abridge, enlarge or modify any substantive right of any litigant and shall preserve the right of trial by jury as at common law and as declared by Article 3, Section 31 of the Constitution of this state; and, as declared by Amendment VII to the Constitution of the United States. Rules of evidence prescribed hereunder shall not alter any statutory provision respecting privileged communications or competency of witnesses.
The defendants cite numerous federal authorities and cases from other states which have held that courts have the inherent authority to require a plaintiff to submit to an independent medical examination. The defendants argue that other Mississippi rules and statutes have lessened the restrictions placed on medical evidence. They point out that under Mississippi Rules of Evidence 503(f), to the extent that any party places his or her physical, mental or emotional condition in issue, he or she thereby waives the physician/patient privilege. See also, Miss. Code Ann. § 13-1-21(4) (Supp. 1988).
Swan contends that the issue is not whether courts have the inherent authority to order an independent medical examination. Swan argues that the language of the trial court's order denying the defendant's motion indicates that it recognized that it had the authority in the appropriate *859 circumstances to order such an examination, but found that good cause did not exist in this case for the examination. The trial court's order reads as follows:
THIS CAUSE coming this day to be heard on motion of Defendants for an independent medical examination of the Plaintiff and the Court having considered the Motion and having heard oral arguments of counsel, finds that Defendants have failed to establish good cause for an independent medical examination of Nancy Swan. It is therefore,
ORDERED AND ADJUDGED
That the Motion of the Defendants to compel an independent medical examination of the Plaintiff Nancy Swan, be and the same hereby is overruled.
The trial court's ruling following oral argument on this motion is not a part of the record.
According to Swan, the trial court did not abuse its discretion in denying the defendants' motion since the defendants had access to all of her medical records and had listed at least seven expert witnesses who would purportedly testify that any injuries suffered by Swan were not caused by the defendants. Swan also contends that the defendants failed to inform the trial court of the extent of the proposed examination and exactly what tests and exams were necessary.
The trial court did not commit error when it refused to order Swan to submit to an independent medical examination. The trial court clearly lacks the authority to order it under the Mississippi Rules of Civil Procedure and this Court has never construed M.R.E. 503(f) to authorize such an action by the trial judge even though the party may have placed his or her physical, mental or emotional condition at issue and thereby waive the physician/patient privilege. See also, Miss. Code Ann. § 13-1-21(4) (Supp. 1988).
What and all we have interpreted M.R.E. 503(f) to allow is access to the physician and to the patient's records by the waiver of privilege. This Court has never interpreted our Rules of Evidence to allow a trial judge to order anything as intrusive as an actual physical examination.
The judgment of the trial court in refusing to order the plaintiff to submit to an independent medical examination is affirmed.
ON DIRECT APPEAL: REVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. ON CROSS-APPEAL: AFFIRMED IN PART AND REVERSED AND REMANDED IN PART FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.
As to Part I and Part II-A: HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., and SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.
As to Part II-B: HAWKINS, C.J., PRATHER, P.J., and SULLIVAN, PITTMAN and BANKS, JJ., concur.
McRAE, J., specially concurs with separate written opinion joined by DAN M. LEE, P.J.
As to Part II-C: SULLIVAN, J., DAN M. LEE and PRATHER, P.JJ., and BANKS and McRAE, JJ., concur.
HAWKINS, C.J., dissents with separate written opinion joined by PITTMAN, J.
ROBERTS and SMITH, JJ., not participating according to Supreme Court Rules.
HAWKINS, Chief Justice, dissenting as to Part II(C):
I do agree with the majority's addressing and answering in this case whether or not a trial court ever has any authority to order a physical or mental examination of a plaintiff in a personal injury action. This question needs to be answered unequivocally and end confusion and disagreement between trial judges. I thank the majority for rendering this service.
The majority, has however, in my deferential view, given the wrong answer.
I would not disagree with a holding that a defendant in a personal injury action has no automatic right to secure a court order directing the medical examination of the *860 plaintiff. It is a matter which should be discretionary with the trial judge in which the core inquiry should be: will such an examination be helpful in obtaining the truth of a disputed fact? Also to be considered is whether such an examination poses any physical danger or will be painful to the plaintiff, e.g., a myelogram.
My disagreement with the majority is its absolute holding: under our law no trial court ever has any authority to order a personal injury plaintiff to undergo any kind of medical examination by a qualified physician.
It is important first to note that our rules of civil procedure and evidence both are patterned after the federal rules, and second, the point in time when we adopted them.
There is no federally-created privileged communication. Rule 501, Federal Rules of Evidence (FRE) provides, in pertinent part:
However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.
Rule 35 of the Federal Rules of Civil Procedure (FRCP) which specifically authorizes a U.S. district court to order a medical examination of a party acknowledges the existence of a physician/patient privilege:
(b)(2) By requesting and obtaining a report of the examination so ordered or by taking the deposition of the examiner, the party examined waives any privilege the party may have in that action or any other involving the same controversy, regarding the testimony of every other person who has examined or may thereafter examine the party in respect of the same mental or physical condition.
The Mississippi Rules of Civil Procedure (MRCP) were adopted by May 26, 1981, order of this Court, effective January 1, 1982. As to any Rule 35, the order states:
Federal Rule 35, Physical and Mental Examinations of Persons, is omitted from these rules. The subject of this rule is beyond the scope of the legislation pursuant to which these rules are adopted. See Miss. Code Ann. § 9-3-63 (1972).
To the reader somewhat puzzled by this comment, I point out that it is identical to the "Proposed Mississippi Rules of Civil Procedure" of May, 1978, which were proposed pursuant to Legislative authority, Miss. Code Ann. § 9-3-61, et seq., Ch. 501, Laws 1975. The final sentence of Miss. Code Ann. § 9-3-63 reads:
Rules of evidence prescribed hereunder shall not alter any statutory provision respecting privileged communications or competency of witnesses.
Miss. Code Ann. § 9-3-71 requires that any proposed rules be submitted to the Legislature for approval. Because the 1976 advisory committee on rules did not consider it had any statutory authority to promulgate a rule similar to Federal Rule 35, it was omitted, and the comment accordingly was made. At that time there was in effect a statute making communications between a patient and doctor privileged, Miss. Code Ann. § 13-1-21 (1972).
The May, 1978, proposed rules were in fact presented to the Legislature for approval, which rejected the package. Resolution Fof Judiciary En Banc Committee, October 10, 1979; Hall v. State, 539 So.2d 1338 (Miss. 1989) (Hawkins, P.J., dissenting, 539 So.2d at 1358).
In May, 1981, this Court adopted the proposed rules of civil procedure on our own. No change was made in the comment to the omitted rule. Under this Court's consistent holdings, beginning in Hall, 539 So.2d at 1339, that we alone have the exclusive rule-making authority under the Constitution, the comment, of course, is meaningless.
When this Court entered its order in May, 1981, adopting the Mississippi Rules of Civil Procedure, there was in effect, as noted, a privileged communication statute as to patients and doctors, Miss. Code Ann. § 13-1-21 (1979).
By order of September 24, 1985, this Court adopted the Mississippi Rules of Evidence *861 (MRE), effective January 1, 1986. Rule 503, MRE, is a rule-created privileged communication.[1] Our own rule, however, contains the following significant exceptions, as noted in the language of the rule and comment thereunder:
(d)(2) Examination by Order of Court. If the court orders an examination of the physical, mental or emotional condition of a patient, whether a party or a witness, there is no privilege under this rule with respect to the particular purpose for which the examination is ordered unless the court orders otherwise.
... .
(f) Any party to an action or proceeding subject to these rules who by his or her pleadings places in issue any aspect of his or her physical, mental or emotional condition thereby and to that extent only waives the privilege otherwise recognized by this rule.
Comment
... .
The second exception under subsection (d) pertains to court-ordered physical or mental examinations. The exception is necessary for the effective utilization of this procedure. It is important to note that the exception is effective only with respect to the particular purpose for which the examination is ordered.
... .
The primary impact of Subsection (f) will be in personal injury actions, although the exception by its terms is not so limited. This subsection, like the remainder of these rules, has no application outside the context of an action pending in a court of this state. See Rules 101 and 1101. By virtue of this exception a party who seeks recovery of damages for a physical, mental or emotional injury waives the privilege for purposes of that action only and to the extent that he or she has put his or her physical, mental or emotional condition in issue by his or her pleadings. With respect to any aspect of the party's physical, mental or emotional condition not put in issue by his or her pleadings, the privilege remains in full force and effect. This provision renders practice in civil actions substantially the same as that prevailing in workers' compensation proceedings. See Miss. Code Ann. § 71-3-15(6) (Supp. 1984).
The language of Rule 503(d)(2) and the comment thereunder clearly envision court-ordered medical examinations. Likewise, the comment under Rule 503(f): "This provision renders practice in civil actions substantially the same as that prevailing in workers' compensation proceedings. See Miss. Code Ann. § 71-3-15(6) (Supp. 1984)." The final sentence of Miss. Code Ann. § 71-3-15(6) reads: "All findings pertaining to a medical examination, either at the instance of the employer or by order of the commission, shall be reported on commission forms and copies made available to both employer and employee." (Emphasis added)
The majority has presented me with an insuperable task of determining just how it can rationally read the exception of Rule 503 out of its holding.
There is no medical privilege to a plaintiff as to any alleged injuries for which he seeks damages in a civil action. If there is no privilege, even aside from the language of the rule which specifically envisions court-ordered examinations, how can this Court say a trial judge's hands are tied insofar as seeking the truth in a personal injury action? What makes that portion of the body or mind of a plaintiff who seeks damages for alleged injuries thereto absolutely off limits, sacrosanct? Are a circuit judge's hands bound even in the face of what appears to him upon proper showing a highly dubious complaint? If any court is to be denied the processes of a court to ascertain the truth, it must be by some specifically created impediment to doing so, either by statute or court rule, not the reverse. Courts do have inherent power to get at the truth of a disputed fact. The majority has it in exactly the reverse order, holding that unless there is a specifically *862 created authority to order an examination, no authority exists.
We must bear in mind that an examining physician, although expressing an opinion as an expert, also testifies to what he as a physician saw. Denying an independent examination altogether is about like excluding some of the eyewitnesses' testimony to an event.
Moreover, even when there was no statutory exception to the privileged communications between a patient and physician, this Court recognized circumstances when a court could order a plaintiff in a personal injury action to be examined by a physician. We have consistently held that when a plaintiff exhibits during trial the portion of his body allegedly injured, he "waives" the medical privilege as to that part of his body, and the court may order a medical examination of it. Fishboats, Inc. v. Welzbacher, 413 So.2d 710, 713 (Miss. 1982); Dennis v. Prisock, 254 Miss. 574, 181 So.2d 125 (1965); Teche Lines, Inc. v. Bounds, 182 Miss. 638, 179 So. 747 (1938); Greyhound Lines, Inc. v. Matthews, 177 Miss. 103, 170 So. 686 (1936). Is the majority overruling these cases?
Rule 503(f) clearly states that when a plaintiff in his pleadings alleging certain injuries, he "to that extent only waives the privilege otherwise recognized by this rule." This rule makes the filing of the lawsuit, not exhibiting the injured portion of the body, a waiver of the medical privilege. Clearly then, unless we emasculate our own rule, there are circumstances when a court can order a medical examination.
Paradoxically, Rule 503(f)'s removal of the privilege makes less likely a need for a court-ordered medical examination. Both sides have an opportunity to talk to the treating physician, depose him, and examine all x-rays, laboratory and medical reports. Unless there is a showing of inaccuracy or incompleteness of these records, there should be no need for additional tests being run, or x-rays made. Courts should also, as above mentioned, bear in mind the potential for danger or pain. For example, there are only so many x-rays that a human being can safely undergo during a lifetime. There may be no need for an independent examination, or at most, one carefully limited by court order.
We would be rendering a better service, in my view, to the bench and bar if we set forth some factors for a judge to consider before ordering an independent medical examination, than simply denying altogether any court's authority to order one.
I therefore dissent.
PITTMAN, J., joins this Opinion.
McRAE, Justice, specially concurring:
I concur in the results of both majority opinions and agree with their reasoning in most respects. I am concerned, however, by Part II(B) wherein the majority has decided to reverse the trial court's limitation on the deposition of twelve additional students who may or may not have suffered toxic exposure. In my view, the trial court did not go far enough and should have entirely prohibited the defense from deposing the additional children concerning their medical conditions at any point in time. The effect Miri's toxic spray may have had on persons other than Nancy Swan is totally irrelevant to the issue of the defendants' liability and whether the defendants' conduct caused the plaintiff's injury. Such inquiry thus exceeds the bounds of permissible discovery. Further, even if such depositions were proper in the first instance, I would hold that the trial court did not abuse its discretion when limiting the scope of the twelve additional depositions.
The threshold question, of course, is whether appellant Nancy Swan has standing to argue for limits on the deposition of non-parties. The majority holds "that Swan has no standing to object on the ground of medical privilege to any discovery about whatever possible effects this spraying had on these children." In so holding, the majority overlooks two important points. First, Swan did not act alone in objecting to the twelve additional depositions: Each of the twelve proposed deponents joined in the Motion for Protective *863 Order which the plaintiff filed on June 8, 1988 (a fact the majority failed to note in its opinion). Secondly, the trial court did not limit the depositions on grounds of medical privilege. The Motion for Protective Order sought to prevent further depositions on grounds of irrelevance, cumulativeness, and inconvenience. The motion never mentions medical privilege. The majority states that the trial court "overruled the protective order" but nevertheless limited "inquiry of these deponents regarding their physical condition." The majority thus intimates that the trial court imposed the limitations on grounds other than those proposed in the motion. Contrary to what the majority suggests, the trial court did not invoke medical privilege sua sponte. In the Order Regarding Motion for Protective Order, the trial court stated in part:
[H]aving heard arguments of counsel and being duly advised in the premises, [the court] is of the opinion that the Motions should be overruled in part and sustained in part. It is therefore,
ORDERED AND ADJUDGED that the Motion for Protective Order by the Plaintiff prohibiting the depositions of... [the twelve additional students] ... is hereby overruled. However, inquiry of these deponents, regarding their physical condition resulting from alleged toxic exposure and treatment by physicians will be limited to October 8, 9, and 10, 1985 and those deponents will not be required to answer any questions regarding any medical treatment received after those dates.
[Emphasis added]. Since the Order sustains the Motion for Protective Order in part, it is apparent that the trial court limited inquiry into the students' physical conditions on the basis of reasons set out in the motion  irrelevancy, cumulativeness, and inconvenience  and not on grounds of medical privilege. Neither the motion nor the trial court's order contain any reference to privilege. Nancy Swan's argument in favor of the limitation, therefore, does not represent an effort to assert medical privilege on behalf of a non-party. Accordingly, she has standing to present her argument to this Court because the question of whether anyone else suffered injury as a result of the defendants' alleged negligence is irrelevant in this case. In any event, it was the appellees, not Nancy Swan, who first broached this question on cross-appeal. To say that Nancy Swan has no standing to address the issue is to allow the cross-appellants' argument to pass unrebutted.
Turning now to the merits of the issue, it is my opinion that the trial court did not err by limiting the scope of the twelve additional depositions. The defense had already deposed four students, all of whom underwent substantially the same experiences as the twelve additional students. There comes a time when a trial judge is entitled to say, in his discretion, that enough is enough. It is axiomatic that "control of discovery is committed to the sound discretion of the trial court." Mayo v. Tri-Bell Indus., 787 F.2d 1007, 1012 (5th Cir.1986). In keeping with this maxim, the federal jurisdictions have determined that a trial court is entitled to prevent or limit depositions which would be cumulative or irrelevant. See, e.g., Wright v. Lockhart, 914 F.2d 1093, 1096-97 (8th Cir.1990) (trial court did not abuse discretion in refusing to order deposition where anticipated testimony was remote in time and cumulative); In re Evangeline Refining Co., 890 F.2d 1312, 1320-21 (5th Cir.1989) (court's refusal to issue subpoena for deposition did not amount to abuse of discretion where "deposition sought was of limited probative value and largely cumulative"); see also Salter v. Upjohn Co., 593 F.2d 649, 652 (5th Cir.1979) (decision of trial court regarding taking of deposition is subject to abuse of discretion standard).
In the instant case, it is unlikely that the search for truth would be substantially furthered by the deposition of twelve students who are all situated similarly to the four students who have already been deposed. The cumulative nature of the proposed additional depositions provides adequate grounds, in my view, for limiting their scope.
While finding that the limitations imposed by the trial court do not, in themselves, *864 represent abuses of discretion. I am nevertheless of the opinion that the trial court did abuse its discretion by not precluding the defense from deposing the additional students concerning their medical conditions at any point in time, even on or before October 10. MRCP Rule 26(b)(1) limits the scope of discovery to requests seeking information which "appears reasonably calculated to lead to the discovery of admissible evidence." It is difficult to imagine what information the defense could obtain from the student deponents that could "lead to the discovery of admissible evidence" not already available from other sources. The majority states that "[t]he physical condition of the students after October 10, 1985, is relevant to Swan's claim ... [s]ince the students were allegedly exposed to the same chemicals for approximately the same length of time as Swan." The effect (or lack thereof) that the chemicals may have had on the children is utterly irrelevant to the question of liability. The burden is on the plaintiff to prove causation of damage as a result of the liability of the defendant. It is personal only to the plaintiff on causation. It is not a numbers game of how many did or did not suffer damages. The old maxim still holds true that a defendant must "take his plaintiff as he finds him." The injury is personal to Swan, and the medical history of the students has no bearing on the causal link between the defendants' conduct and Swan's condition. To say that the medical condition of the students is probative on the issue of whether Swan was injured is like saying that the medical condition of all passengers involved in a bus accident is relevant to whether a particular plaintiff suffered injury. The proposition is absurd.
The majority also suggests that the medical condition of the students is relevant to the issue of liability. In so holding, the majority is mixing apples and oranges. The question of liability is limited to inquiry concerning whether the defendants were responsible for the release of toxic chemicals. Who was injured and to what extent is another issue altogether. The existence or degree of injury has no bearing whatsoever on whether I.P., Inc., et al., were responsible for releasing poisonous substances.
Finally, we must consider the implication of the majority's ruling in the context of other personal injury cases. Should a large asbestos manufacturer who defends against an asbestosis action be permitted to depose all other persons who may have come into contact with its product simultaneously with the plaintiff concerning their medical conditions? Should a tobacco company who is sued by a cancerous smoker be allowed to depose every person who ever used its product? The answer of any reasonable person, of course, would be, "No." Such deposition testimony would be irrelevant and cumulative. Even worse, such practices allow litigants to play the "numbers game" and put on evidence concerning the proportion of persons exposed to a given danger who suffered or did not suffer injury.
Today's majority ruling appears to sanction such abuses of discovery. The practices condoned by the majority will cause the cost of litigation  already too high  to zoom into outer space. Instead of reversing the trial court for limiting the deposition of the twelve additional students, I would reverse the order to the extent it allowed additional depositions as to the medical condition of persons other than the plaintiff.
DAN M. LEE, P.J., joins this opinion.
NOTES
[1] Per Hall, Miss. Code Ann. § 13-1-21 was "repealed." See also Rule 1103 MRE.